IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID JASLAR, et al.,                    :
                                         :
          Plaintiffs                     :
                                         :
     vs.                                 :        3:CV-05-2080
                                         :        (JUDGE VANASKIE)
DET. ROBERT ZAVADA, et al.,              :
                                         :
          Defendants                     :

<u>MEMORANDUM</u>

Plaintiffs David Jaslar and Jason Fierman have brought this action to recover

damages under 42 U.S.C. § 1983 and the common law of Pennsylvania, claiming that they

were falsely arrested and maliciously prosecuted on arson charges.[1]  The Defendants are

David Lupas, former District Attorney of Luzerne County, who purportedly participated in the

investigation and approved the charges brought against Plaintiffs; Robert Zavada, a

detective with the Wilkes-Barre Police Department who participated in the investigation and

the preparation of the affidavit of probable cause used to procure a warrant for the arrest of

Plaintiffs and the filing of criminal charges; and Bernard Kizis, a Pennsylvania State Police

Trooper, who also participated in the investigation and the preparation of the probable

cause affidavit.  Defendants have moved separately for summary judgment, and the

---

[1]For the convenience of the reader of this decision in electronic form, hyperlinks to
authority and the record have been inserted.  The use of a particular service for hyperlinks
is not intended as any endorsement of that service.

Magistrate Judge to whom this matter had been referred for pretrial management purposes has recommended that summary judgment be granted in favor of Defendants on Plaintiffs' civil rights claims and that the Court decline to exercise supplemental jurisdiction over the state common law claims.  Plaintiffs have objected to the Magistrate Judge's Report and Recommendation.

Having carefully reviewed the record <u>de novo</u>, I have concluded that there are genuine disputes of fact material to the question of whether Defendants Zavada and Kizis deliberately, or with reckless disregard for the truth, made false statements and omitted pertinent facts in their probable cause affidavit, thus requiring denial of their summary judgment motions.  As to Defendant Lupas, however, I find that there is no evidence that he was involved in the fabrication of false statements during the course of the investigation, and that his conduct in approving the filing of charges against Plaintiffs is protected under the doctrine of absolute immunity afforded prosecutors.  I also find that he is immune from suit with respect to Plaintiffs' common law claims under the Pennsylvania doctrine of "high official" immunity.  Accordingly, summary judgment in favor of Defendant Lupas is warranted.

<u>BACKGROUND</u>

Plaintiffs entered into a partnership for the purpose of opening a business to be known as Double J's Grill and Deli.  In March of 1999, they executed a lease with Virgil and

Victoria Argenta, owners of a building located at 458-460 North Main Street, Wilkes-Barre, Pennsylvania, for the purpose of opening Double J's Grill and Deli.  The lease required Plaintiffs to pay $1,500 per month as rent and $200 per month as a "realty tax contribution."

Plaintiffs procured a loan in the amount of $22,500 through the Small Business Administration ("SBA") to make the necessary renovations to the leased premises and to open the restaurant/deli.  As part of the loan terms, Plaintiffs obtained fire insurance for the proposed business in the amount of $15,000, apparently the minimum amount of insurance that SBA regulations required Plaintiffs to have in place.

The Argentas had also procured insurance on the premises.  Although having purchased the property for $25,000 about one year before the fire, the property was insured by the Argentas for more than $600,000 at the time of the fire.  This policy had been procured through A.J. Lupas Insurance, the owners of which are related to Defendant Lupas.

On June 8, 1999, the building at 458-460 North Main Street was destroyed by fire. Defendants Zavada and Kizis were assigned to investigate the cause and origin of the conflagration.  Defendant Lupas delegated to Assistant District Attorney Tim Doherty the responsibility of supervising the investigation.

The investigating law enforcement officers determined that the fire had been set deliberately.  In particular, they found that there were several points of origin of the fire and

that a flammable liquid spread throughout the rear part of the building had been ignited intentionally in an attempt to destroy the building.

On May 14, 2004, nearly five years after the fire and less than one month before the applicable statute of limitations on criminal charges would expire, Defendants Zavada and Kizis executed affidavits of probable cause in support of a criminal complaint and applications for warrants for the arrest of Plaintiffs on charges of arson, criminal mischief, causing or risking a catastrophe, and criminal conspiracy.  Plaintiffs were not taken into custody, however.  Instead they voluntarily appeared before a District Magistrate for a preliminary arraignment.  They were released on an unsecured bail bond of $20,000.

A preliminary hearing on the charges was held on July 1, 2004.  The District Magistrate bound over to the Court of Common Pleas the charges against Plaintiff Jaslar, but dismissed the charges against Plaintiff Fierman.  Jaslar thereafter challenged the sufficiency of the evidence by way of a habeas corpus petition, which was granted by the Court of Common Please of Luzerne County on or about May 11, 2005.

Plaintiffs commenced this action on October 7, 2005.  They contend that the affidavits of probable cause included materially false statements and deliberately omitted exculpatory information.  They assert that had the material false statements been excised and the exculpatory information included a District Magistrate would not have found probable cause to warrant the issuance of the criminal complaints and the arrest warrants.

4

They contend that the District Attorney acted improperly in supervising the investigation that culminated in their prosecution.  Plaintiffs further claim that then-District Attorney Lupas was pressured into filing charges against them because the insurance policy issued to the Argentas provided that, in the event of arson, benefits under the policy were payable only if criminal charges were brought against someone other than the Argentas.

Following the completion of discovery, each of the Defendants moved separately for summary judgment.  All Defendants argued that the evidence adduced by Plaintiffs failed to show that there was an absence of probable cause to arrest and prosecute the Plaintiffs, and that Plaintiffs could not show, in any event, that Defendants acted with the requisite culpable state of mind in pursuing the arrest and prosecution.  Defendant Lupas also raised the defense of absolute immunity with respect to the civil rights claims pursued against him as well as the defense of high official immunity with respect to Plaintiffs' Pennsylvania common law claims.

The Magistrate Judge to whom this matter had been referred for pretrial management agreed with the Defendants that the evidence could not show an absence of probable cause for the charges.  He also found the evidence insufficient to show that the Defendants acted with knowledge of falsity of certain statements and with deliberate or reckless disregard for the truthfulness and completeness of the probable cause affidavit.  The Magistrate Judge further found that the civil rights claims asserted against Defendant

Lupas were barred by the absolute immunity afforded prosecutors acting in a prosecutorial capacity. Recommending that this Court decline to exercise jurisdiction over the pendant state law claims, the Magistrate Judge did not address the issue of high official immunity asserted by Defendant Lupas.

Plaintiffs timely filed objections to the Report and Recommendation. Following briefing on the objections, oral argument was conducted.

II. DISCUSSION

A. Probable Cause and Culpable State of Mind

A key issue central to both the § 1983 false arrest and § 1983 malicious prosecution claims asserted by Plaintiffs is whether the Defendants acted without probable cause to accuse the Plaintiffs of deliberately setting the fire that destroyed the Argentas' building.[2]

---

[2]To state a claim for false arrest, a plaintiff must establish two elements: "(1) that there was an arrest; and (2) that the arrest was made without probable cause." Barnes v. Plainsboro Twp. Police Dept., Civ. A. No. 07-1776, 2007 WL 2011264, at *2 (D. N.J. July 6, 2007). To prevail in a § 1983 malicious prosecution action, a plaintiff must establish the following elements:

(1) The defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] Plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of a seizure as a consequence of the legal proceeding.

Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003). The summary judgment motions focus on the absence of probable cause element common to the §1983 false arrest

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been . . . committed by the person to be arrested." Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995).  "Generally 'the question of probable cause in a § 1983 damage suit is one for the jury, ' . . . particularly . . . where the probable cause determination rests on credibility conflicts.'" Merkle v. Upper Dublin School District, 211, F.3d 782, 788 (3d Cir. 2000).  A district court, however, may find the existence of probable cause as a matter of law "'if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding' . . . ." Id. at 788-89.

In this case, Defendants sought the imprimatur of a judicial officer by applying for arrest warrants supported by affidavits of probable cause.  The issuance of an arrest warrant by a District Magistrate, of course, "does not, in itself, shelter an officer from liability for false arrest." Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000).  Where, as here, a party seeks recovery of damages under §1983 for an allegedly false arrest made pursuant to a warrant, that party must show "(1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" Id. at 786-87.  In the context of a case such

---

and malicious prosecution claims.

as this one, the materiality of the alleged misstatements and purported omissions is determined by excising from the probable cause affidavit the alleged "offending inaccuracies and insert[ing] the facts recklessly omitted, and then determin[ing] whether or not the 'corrected' warrant affidavit would establish probable cause." Id. at 789.

In this case, the Magistrate Judge confined the analysis of the probable cause issue to those alleged misrepresentations and omissions specifically pled in Plaintiffs' Complaint, thus ignoring other alleged misrepresentations and omissions claimed to have been learned by Plaintiffs during discovery. The Magistrate Judge restricted the analysis to the pled misstatements and omissions after concluding that, by failing to respond to Defendant Zavada's Request for Admissions, Plaintiffs would be deemed to have admitted that the pleadings set forth all the material misstatements and omissions.[3]

Plaintiffs object to the decision of the Magistrate Judge to confine his analysis to the alleged misrepresentations and omissions that had been specifically pled. They argue that

---

[3]Defendant Zavada's Request for Admissions asked Plaintiffs to admit or deny that the alleged false statements included in the probable cause affidavit were five specific statements alleged in paragraph 30 of their Complaint, and that the material omissions from the affidavit were the four specific statements asserted in paragraph 33 of the Complaint. It is undisputed that Plaintiffs' counsel did not respond to the Request for Admissions, a circumstance that supports the Magistrate Judge's determination that the requests should be deemed admitted. See Fed.R.Civ.P. 36(a)(3). Plaintiffs' lawyers explain, however, that they did not respond to the Request for Admissions because they did not receive them, pointing out that they had been sent to an incorrect address, albeit the address of record for Plaintiffs' counsel in this matter. The Magistrate Judge properly faulted Plaintiffs' counsel for not correcting their record address.

they should be allowed to withdraw the admissions pursuant to Fed.R.Civ.P. 36(b), which allows for the withdrawal of an admission "if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits."

At the conclusion of the oral argument conducted in this matter on September 4, 2008, I sustained Plaintiff's objections to that part of the Report and Recommendation that deemed the requests for admissions conclusively admitted, finding that Plaintiffs' counsel had presented a credible explanation for their failure to respond to the request; that any prejudice to the defense was minimal because the additional alleged misstatements and omissions were fully developed during discovery;[4] and that consideration of all the alleged misstatements and omissions would serve the interests of justice (Oral Argument Tr., Dkt. Entry 122, at 40-42.)  Accordingly, the issues of the absence of probable cause to support the arrest and prosecution of Plaintiffs and the Defendants' culpable state of mind will be decided in the context of all alleged material misrepresentations in and omissions from the probable cause affidavit for which there is evidentiary support.

The premise for the affidavit of probable cause presented to the District Magistrate by Defendants Zavada and Kizis was that Jaslar and Fierman had both the motive and

---

[4]It is worth nothing that the Complaint alleged that the false statements and omitted exculpatory information included, but were not limited to, those specifically pled.

opportunity to set the fire, and were observed at the building just before the fire occurred.  In this regard, the affidavit of probable cause set the time of the fire at approximately 3:30 p.m. on June 8, 1999.  The affidavit relates that Jaslar and Fierman were in the process of making renovations to that part of the building from which they were to conduct their restaurant/deli.  Although Plaintiffs wanted to be open by June 14, 1999, much work remained undone.  On the date of the fire, a Wilkes-Barre city building inspector informed Plaintiffs of a number of code violations and structural deficiencies.  According to the affidavit of probable cause, the building instructor stated that the most important deficiency "was the lack of 'fire rating' above the ceiling of the proposed dining room area."  The building inspector, according to the probable cause affidavit, informed Plaintiff "that if this building (458 N. Main St.) ever had a fire, it would cause extreme damage due to the violation."

The affidavit of probable cause includes averments pertaining to financial difficulties encountered by Plaintiffs in opening their business.  In this regard, the affidavit avers that outstanding bills exceeded available financial resources.  The affidavit states that "[t]here was no income being generated from the business itself and due to structural and building code related problems . . ., it was not feasible that the business would generate any income without much additional expense to the [Plaintiffs]."  The affidavit then relates that Plaintiffs' obligations under the lease would terminate in the event that the building was completely

destroyed by fire.  The affidavit reports that one of the laborers performing renovation work on the building overheard Plaintiffs saying they had to get out of their lease.  Finally, on the matter of motive, the affidavit relates that Plaintiffs had an insurance policy for their proposed business venture in the amount of $15,000, and had inquired about increasing the limits on the contents of the premises to $35,000 shortly before the fire.

According to the affidavit, two individuals saw both Plaintiffs at the premises minutes before the fire was reported.  The affidavit further avers that the front doors to the business were found unlocked, with Zavada and Kizis asserting that this fact "suggests that the defendants left the building abruptly."

The affidavit reports as significant forensic evidence the existence of two melted plastic bottles found to have contained a mixture of gasoline and a medium petroleum distillate.  Also found in the same area as the melted plastic bottles was a pair of leather work gloves, that also contained evidence of a mixture of gasoline and a medium petroleum distillate, as well as evidence of a heavy petroleum distillate described as diesel fuel or home heating oil.  A mixture of gasoline and medium petroleum distillate matching the contents of the melted plastic containers was also detected on a sample of charred debris collected near the rear of 458 N. Main Street.

According to the affidavit, Jaslar admitted to purchasing the charcoal starter fluid found in the melted plastic bottles, explaining that this substance had been used to clean tile

flooring installed as part of the ongoing renovations.  The affidavit also reports that an

accelerant detection dog did not indicate a hit in the areas where the cleaning allegedly had

taken place, but did indicate that the substance was found among fire debris further to the

rear of the leased premises in an area used for storage with no tile flooring.

Finally, the affidavit suggests dissembling on the part of Jaslar, stating that he

initially denied ever venturing into parts of the building not leased by him and Fierman. After

what the affidavit describes as "a speculative media report attempting to link a separate

theft investigation in Lackawanna County to this fire," Jaslar contacted Defendant Zavada

"to report that he and Fierman had been into the other rooms and floors when the owner

wasn't around."  Jaslar purportedly stated that he suspected items he had seen throughout

the building were stolen property.

Clearly, the affidavit executed by Kizis and Zavada is sufficient to support probable

cause for filing of charges against Plaintiffs.[5]  Indeed, Plaintiffs do not contend that the

affidavit, on its face, failed to supply probable cause for the accusations made against them.

Plaintiffs do claim, however, that the probable cause affidavit is rife with false

statements.  First, they assert that the affidavit falsely attributes to Jeff Hanawalt a

statement that Plaintiffs said "we have to get out of this lease," when, in fact, Mr. Hanawalt

---

[5]The filing of the criminal complaint and arrest warrant application was approved by
the Assistant District Attorney assigned by Defendant Lupas to supervise the investigation.

told Defendant Zavada that he never heard such a conversation between Plaintiffs and denied ever making such a statement.[6]  Although excising this statement from the probable cause affidavit may not, in and of itself, preclude a finding of probable cause, it does suggest that Defendants either deliberately misrepresented this statement or acted with reckless disregard for the truth.[7]

Another purportedly false statement presented in the probable cause affidavit is that Plaintiff Fierman was observed to be on the premises between 3:00 p.m. and 3:20 p.m. on June 8, within minutes of the fire being reported.  Plaintiffs assert that there were no witnesses who placed Fierman at the scene at that time, referencing the preliminary hearing transcript.  Plainly, absence of evidence establishing the presence of a party at the scene of an alleged arson is material to the question of whether there is probable cause to charge

---

[6]Mr. Hanawalt was employed by Fran Caruso, who had been retained by the Argentas and by Plaintiffs to perform renovation work on the premises.

[7]The Magistrate Judge properly observed that the evidentiary source for Plaintiffs' assertion – a newspaper article reporting that Hanawalt adamantly denied ever making such a statement to Defendant Zavada – may not constitute admissible evidence.  If hearsay is capable of being admissible at trial, however, it can be considered on a motion for summary judgment.  See Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co, 998 F.2d 1224, 1234 n.9 (3d Cir. 1993).  In this case, the statements attributed to  Hanawalt in the newspaper article are capable of proof through admissible evidence, and thus can be considered.  See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 102 (3d Cir. 1999) (hearsay evidence presented on a summary judgment motion found to be capable of being admitted at trial on the premise that declarant would so testify at trial); Rossi v. Standard Roofing, Inc., 156 F.3d 452, 470 n.13 (3d Cir. 1998) (same); J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (same).

that person with arson.[8]  The Magistrate Judge observed that "the evidence simply does not show that defendants Kizis and Zavada knew or should have known that [this statement was] not true."  The absence of testimony corroborating the assertion made in the probable cause affidavit, however, is at least sufficient to create a genuine issue of fact on the question of whether the statement was made with reckless disregard for its truth.   In this regard, it is noteworthy that neither Zavada nor Kizis had procured a signed witness statement placing Fierman at the scene shortly before the fire was detected.[9]

Plaintiffs also assail the accuracy of the statement in the probable cause affidavit that Plaintiff Jaslar admitted purchasing the charcoal starter fluid that Defendants believed to be the accelerant of the fire.  A review of the report of Defendant Zavada does not disclose any such admission by Jaslar.  Defendants contend that this purportedly false statement is immaterial as Plaintiffs conceded the presence and use of charcoal starter fluid to clean ceramic tile installed as part of the renovations.  But the probable cause affidavit

---

[8]As noted above, the charges against Fierman were dismissed at the preliminary hearing stage, and he was not re-charged.

[9]The point here is that if sources dispute making statements attributed to them by investigators, there exists a genuine dispute of fact.  At a minimum, there is a genuine dispute as to whether Mr. Hanawalt told Defendants Zavada and/or Kizis that he overheard Plaintiffs expressing a desire to get out of their lease, and there is a genuine dispute as to whether either Defendant was told that Fierman was observed at the scene of the fire shortly before it was reported.  These disputes are material to both probable cause and to scienter.   That is, if the disputes are resolved in Plaintiffs' favor, a jury could find that Defendants Zavada and Kizis deliberately misrepresented these facts for the purpose of procuring a prosecution for which they otherwise lacked probable cause.

insinuated that Jaslar bought the charcoal starter fluid for the purpose of torching the building.  In this regard, the probable cause affidavit not only said that Jaslar had admitted purchasing the charcoal starter fluid, but also that there was no receipt for the purchase, "as required by record keeping standards of S.B.A. loans." Taken together, the false statement of purchase coupled with the absence of an allegedly required receipt suggested a sinister purpose attributable to Jaslar.  Thus, contrary to Defendants' assertions, the purportedly false statement of purchase by Jaslar is indeed material to a finding of probable cause.

Plaintiffs also point to a number of purportedly material omissions suggesting that the probable cause affidavit was prepared with a reckless disregard for the truth.  One of such purported omissions is the failure to note that, while the doors to the deli were found unlocked, Virgil Argenta told the investigators that Plaintiffs frequently left the door unlocked.  Instead of reporting this statement, the probable cause affidavit asserted that "[t]he fact that the front doors were found unlocked suggest the defendants left the building abruptly." As Plaintiffs argue, the truthful statement (the front doors were found unlocked) coupled with the editorial assertion of a hasty exit, while omitting the fact that it was not unusual for Plaintiffs to leave the doors unlocked, is plainly relevant to a determination of probable cause. Thus, the omission is indeed material.

Plaintiffs also complain that the affidavit failed to include the fact that witnesses other than Plaintiffs had attested to the use of the charcoal starter fluid to clean the tile floor.  This

omission is material, Plaintiffs contend, because the affidavit states that an accelerant detection dog did not indicate a "hit" in the areas where Jaslar indicated cleaning had taken place.  As Plaintiffs observed, the fact that persons other than Jaslar said that the charcoal starter fluid had been used in the area where no "hit" had been detected by the dog would tend to undermine the significance of the failure of the dog to record a hit in that area.[10]

Yet another material omission is the fact that the general contractor employed by Plaintiffs and Virgil Argenta, Fran Caruso, had passed away.  The affidavit of probable cause attributes a number of statements to Mr. Caruso, and certainly the fact that he died, creating a cloud on the admissibility of statements attributed to him, is material to the question of whether probable cause exists.  Also material is the omitted fact that a Luzerne County inmate had told Defendant Zavada that Mr. Caruso had approached the inmate about setting fire to the building.

Plaintiffs also claim that the probable cause affidavit should have indicated that the Argentas had multiple insurance policies on the fire site, aggregating more than $600,000, even though the building had been bought in May of 1998 for $25,000.  In that the investigators considered significant the fact of insurance on contents procured by Plaintiffs, it would appear material to disclose all insurance on the premises for purposes of identifying

---

[10]In this regard, it is also significant that there is evidence that the accelerant detection dog hit on areas where subsequent chemical analysis found no accelerant, thus suggesting the lack of reliability of the results of the accelerant detection dog.

others who may have had a financial motive to cause the destruction of the building.

Moreover, to the extent that the investigators considered it significant to mention the fact

that Plaintiffs made an inquiry about increasing the amount of insurance coverage shortly

before the accident, it would seem equally probative to disclose the fact that Virgil Argenta

sought to increase coverage on the policies on the building just before the fire by sending a

check for a new premium to the insurance agency, believing that this action would secure

additional coverage.[11]

Also material to the question of probable cause is the apparent fact that the Argentas

were unable to collect on their insurance policies until someone other than the Argentas

was charged with arson.  Coupled with the fact that the charges were filed just before the

statute of limitations was to expire, this fact would seem material to the question of whether

there was probable cause to believe that the Plaintiffs were responsible for the arson.

Yet another alleged omission is the failure to reference a message left by Virgil

Argenta on Mr. Caruso's answering machine on the night of the fire.  The evidence

suggests that Argenta inquired about the scheduled installation of carpeting the next day,

<u>after</u> learning of the building's total destruction.  Again, this fact would serve to undermine

the contention that Plaintiffs were responsible for the fire by suggesting an attempt by

---

[11]In this regard, it is also noteworthy that Plaintiffs contend that it was Virgil Argenta
who suggested to them shortly before the fire that they should obtain additional insurance
coverage.

another person to fabricate an alibi defense.

Plaintiffs further assert that the likelihood of finding probable cause as to them would have been minimized had the probable cause affidavit mentioned the fact that Dean Argenta, Virgil Argenta's brother, was under investigation for the theft of merchandise from Home Depot, and Dean Argenta had said that stolen property was being stored in his brother's building.  In this regard, the report of Defendant Zavada states that Virgil Argenta was very angry that representatives of the Pennsylvania Attorney General's office were at the scene of the fire when he first arrived, and that Virgil Argenta refused to cooperate with the investigation at that time.

A corrected affidavit, as asserted by Plaintiffs, would include the following:

(1) Fran Caruso is deceased.  An inmate at the Luzerne County jail had told the investigators that Caruso had approached him about setting fire to the building.[12]

(2) Virgil and Victoria Argenta, the owners of the building located at 458-460 N. Main Street, Wilkes-Barre had multiple insurance policies on the fire site, which Virgil Argenta believed totaled more than $600,000, even though they had bought the building a year before for only $25,000.

---

[12]Defendants point out that the inmate failed a polygraph examination and was found by Defendants to be not credible.  It is nonetheless significant that this information was available to the investigators when they filed their probable cause affidavit.  Of course, the fact that the inmate failed a polygraph examination, if proven, would support an assertion that the decision to omit his confession from the affidavit was not done with a reckless disregard for the truth.

(3) The insurance policies were bought through A. J. Lupas Insurance, and the District Attorney of Luzerne County was related to the owners and operators of A. J. Lupas Insurance.

(4) A few weeks before the fire, Virgil Argenta sought to increase his coverage on his main policy from $150,000 to $415,000.

(5) The Argentas were unable to collect on the insurance policies until someone other than themselves was charged with arson.

(6) At the time of the fire, Federal, State and local law enforcement officers were investigating Dean Argenta, Virgil's brother, in connection with the theft of merchandise from Home Depot.

(7) The Pennsylvania Attorney General's Office had an affidavit stating that Dean Argenta had told a police source that Virgil Argenta was storing stolen merchandise from Home Depot in the building.

(8) When Virgil Argenta arrived on the scene on the night of the fire, he was angry that representatives of the Pennsylvania Attorney General's Office were at the scene, and refused to cooperate with the investigation that night.

(9) Dean Argenta was arrested and charged by the Pennsylvania Attorney General's Office for the theft of the Home Depot items in April, 2000.

(10) Although Plaintiffs had inquired about increasing the insurance coverage on their property located at the building, they did not take any steps to increase their insurance coverage.

(11) The amount of insurance coverage maintained by Plaintiffs on the property was the minimum amount required to obtain the SBA loan.

(12) Plaintiff Fierman was not seen near the building between the hours of 3:00 and 3:20 p.m. on June 8, 1999.

(13) Although the front door to the deli was found unlocked, it was not unusual for the Plaintiffs to leave the premises with the door unlocked.

(14) Although the accelerant-sniffing dog did not hit on areas where Plaintiffs claimed charcoal starter fluid was used to clean tile, other witnesses confirmed use of the charcoal starter fluid for that purpose.

(15) Virgil Argenta made a phone call to Fran Caruso on the night of the fire, which was tape recorded, after Argenta knew about the fire, but did not mention anything about the fire during the call, only asking about the status of the work on the building and reminding Caruso that carpet was to be installed the next day.

Plaintiffs have presented evidence sufficient to support the existence of each of the facts mentioned above.  They have also presented evidence sufficient to support an inference that certain statements made in the affidavit were either intentionally or recklessly false, such as the statement that Plaintiffs were overheard saying that they had to get out of their lease, and that Plaintiff Fierman was observed to be at the scene between 3:00 and 3:20 p.m. on the day in question.  Moreover, they have presented evidence to suggest that certain statements were omitted with a conscious disregard of their materiality to the issue of who was responsible for setting the fire.[13]  Under these circumstances, it cannot be concluded as a matter of law that a properly corrected affidavit would have established probable cause to believe that Plaintiffs committed the crimes for which they were charged.[14] Moreover, it cannot be concluded as a matter of law that Defendants Zavada and

---

[13]It should be noted that there is no evidence that Defendant Lupas fabricated any evidence or knew of the alleged false statements and omissions.

[14]Although there may be no duty to include every piece of evidence and all exculpatory information in a probable cause affidavit, the determination of whether the officers acted with knowledge of the absence of probable cause necessarily must

Kizis failed to act with the requisite culpable frame of mind.[15]  Accordingly, Defendants Kizis

and Zavada are not entitled to summary judgment on the § 1983 claims asserted against

them.[16]

---

encompass all alleged misstatements and omissions that the Plaintiffs have shown were known by the investigators.  See Orsatti, 71 F.3d at 484 (for purposes of assessing whether police officers acted in the absence of probable cause the court focuses on the information available to and known by the officers at the time of their alleged unlawful conduct); see also Porter v. Gray, Civil Action No. 05-231, 2007 U.S. Dist. LEXIS 10143, at *41 (W.D. Pa. Feb. 13, 2007) (omission of reference to a shooting that supported defendant's theory of who committed arson found to be reckless disregard for truth).

[15]Defendants Kizis and Zavada also sought summary judgment on the grounds of qualified immunity.  Summary judgment on a qualified immunity defense in the context presented here is appropriate only if a reasonable officer could have believed that probable cause existed to arrest Plaintiffs "'in light of clearly established law and the information the . . . officers possessed.'"  Blaylock v. City of Philadelphia, 504 F.3d 405, 411 (3d Cir. 2007).  In this case, accepting as true the evidence presented by Plaintiffs, it cannot be said that a reasonable officer could have found probable cause to arrest and prosecute Plaintiffs.  Accordingly, summary judgment in favor of Defendants Kizis and Zavada on qualified immunity is not warranted.  Id. at 414.  Defendant Zavada likewise is not entitled to summary judgment on the state common law claims of false arrest, malicious prosecution, and civil conspiracy as the genuine disputes of fact are material to those claims as well.

[16]Defendant Lupas also sought summary judgment on the ground that neither Plaintiff suffered a loss of liberty consistent with the concept of a Fourth Amendment seizure.  The Magistrate Judge, observing that neither Plaintiff had been required to post bail and were restrained only to the extent that they could not travel outside the Commonwealth of Pennsylvania, agreed with the contention of Defendant Lupas.  (Report and Recommendation, Dkt. Entry 101, at 52-56.)  Plaintiffs objected to the recommendation that the § 1983 malicious prosecution claim against Defendant Lupas be dismissed on this ground, pointing out that the Magistrate Judge had erred in finding that they were not required to post bail.  In this regard, Plaintiffs presented a copy of the Bail Bond executed by Plaintiff Jaslar.  (Exhibit "R" to the Objections to the Report and Recommendation, Dkt. Entry 104.)  Significantly, however, the Bail Bond conditions do not preclude travel outside the Commonwealth of Pennsylvania.  The only evidence presented by Plaintiffs on the

B.  The Claims Against Defendant Lupas

In addition to asserting the defense of qualified immunity and challenging the

sufficiency of Plaintiffs' evidence on the false arrest and malicious prosecution claims,

Defendant Lupas asserted affirmative defenses to the civil rights and common law claims

unique to him: absolute prosecutorial immunity and high official immunity, respectively.

Each defense will be addressed seriatim.

It is well-established that "state prosecutors are absolutely immune from liability

under § 1983 for actions performed in a quasi-judicial role." Yarris v. County of Delaware,

---

matter of travel restrictions is their testimony, and even this evidence is questionable both in
terms of its admissibility and probative value.  In this regard, Jaslar testified that it was his
lawyer, and not the District Magistrate, who told him that he could not leave the state.
(Jaslar Dep. at 56.)  Although Fierman testified that the District Magistrate told him that he
was not allowed to leave Pennsylvania (Fierman Dep. at 14), he did not present a copy of
his bail bond or any other competent proof on this point.  Significantly, Rule 257(b) of the
Pennsylvania Rules of Criminal Procedure mandates that any non-monetary condition of
release must be set forth "with specificity on the bail bond. . . ."  Any restriction imposed by
the District Magistrate that is not included in the bail bond would seem to be unenforceable.
While the requirement of signing an unsecured bail bond coupled with a restraint on travel
may bring this case within Gallo v. City of Philadelphia, 161 F.3d 217 (3d Cir. 1998), holding
that "pretrial restrictions on travel and required attendance at court hearings" constitute a
"Fourth Amendment seizure" for purposes of a § 1983 malicious prosecution claim, there is
an absence of evidence that Plaintiff Jaslar was subject to any court-imposed travel
restrictions and it appears that there may be an absence of competent evidence that
Plaintiff Fierman was subject to any travel restraint or bail requirement.  There is no need,
however, to decide this issue at this time.  Neither Zavada nor Kizis sought summary
judgment on the ground that Plaintiffs are unable to prove a deprivation of liberty consistent
with the concept of seizure, and the fact that Defendant Lupas is entitled to absolute
immunity on the § 1983 malicious prosecution claim obviates further consideration of this
issue at this time.

465 F.3d 129, 135 (3d Cir. 2006). Embraced within the doctrine of absolute prosecutorial immunity is "conduct in 'initiating a prosecution and in presenting the State's case . . . ." Burns v. Reed, 500 U.S. 478, 486 (1991). "The primary purpose of absolute prosecutorial immunity is to protect the judicial process itself . . . ." Gleeson v. Robson, No. 02-CV-1747, 2005 WL 1210948, at *31 (M.D. Pa. 2005), aff'd, 190 F. App'x 165 (3d Cir. 2006). "The decision to initiate a prosecution is at the core of a prosecutor's judicial role." Kulwicki v. Dawson, 969 F.2d 1454, 1460 (3d Cir. 1992). It is thus clear that Defendant Lupas, to the extent that he approved the criminal complaint drafted by Defendants Zavada and Kizis and the commencement of the prosecution against Plaintiffs, is entitled to absolute immunity. Imbler v. Pachtman, 424 U.S. 409, 431 (1976) ("in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983"); Gleeson, 2005 WL 1210948, at *33.

Plaintiffs contend that Lupas was pressured by Virgil Argenta and his attorney to commence the prosecution against them so that Argenta could collect on his insurance coverage. They point to evidence indicating that Defendant Lupas did not believe that there was sufficient evidence to commence a prosecution several years before apparently authorizing the prosecution of Plaintiffs, as well as to evidence suggesting that Argenta and his attorney were applying pressure to have charges filed. This evidence, however, does not defeat the applicability of the doctrine of absolute prosecutorial immunity. "A prosecutor

is absolutely immune when making [the decision to initiate a prosecution], even where he acts without a good faith belief that any wrongdoing has occurred." Kulwicki, 969 F.2d at 1464.[17]

Plaintiffs contend that even if the decision to commence prosecution is shielded by absolute immunity, Defendant Lupas may nonetheless be held liable due to his role in the investigation that preceded the filing of charges.  In this regard, it is well-established that a prosecutor is protected only by qualified immunity when acting in an investigative or administrative capacity.  Id. at 1463.  Thus, for example, a prosecutor who fabricates evidence before a special grand jury was convened to investigate the alleged criminal conduct is not protected by absolute immunity.  See Buckley v. Fitzsimmons, 509 U.S. 259, 271-72 (1993).  Destroying exculpatory evidence has been found to be "not related to a prosecutor's prosecutorial function," and thus not covered by absolute immunity.  Yarris, 465 F.3d at 136.  On the other hand, withholding exculpatory evidence falls within the exercise of prosecutorial discretion, and is therefore protected.  Id. at 137.

The Supreme Court has instructed that in determining the scope of prosecutorial

---

[17]In Kulwicki, the plaintiff alleged that the prosecutor compelled a law enforcement officer to file a criminal complaint against the plaintiff solely for political motives, the plaintiff being a political rival of the prosecutor.  This fact, our court of appeals found, was not sufficient to defeat absolute immunity, explaining that "[c]onsideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity . . . ." Id. at 1464.

immunity, "it is important to determine the precise claim that . . . has been made against" the prosecutor.  Burns, 500 U.S. at 487.  In this case, Plaintiffs assert that Defendant Lupas played an active role in the investigation.  This broad assertion, however, is not supported by evidence.  The fact that Defendant Lupas appointed an Assistant District Attorney to assist the law enforcement officers does not show personal involvement on the part of Defendant Lupas.  The fact that he met with the law enforcement investigators on a few occasions does not, in and of itself, expose him to personal liability.  Significantly, unlike cases that have found prosecutors potentially liable, there is no evidence in this case that Defendant Lupas participated in the fabrication of evidence or in the willful destruction of exculpatory evidence.  There is no evidence that Defendant Lupas gave Defendants Zavada and/or Kizis advice that could result in the denial of Plaintiffs' constitutional rights. Indeed, there is no evidence that he gave any particular advice to the law enforcement officers.[18]

Under these circumstances, Defendant Lupas has shown his entitlement to absolute immunity and Plaintiffs have not shown any conduct of Defendant Lupas that violated their constitutional rights prior to the commencement of the prosecution.  Accordingly, Defendant

---

[18]There has to be conduct by the prosecutor during the investigatory phase of the matter that the prosecutor "'could be expected to know . . .  would violate statutory constitutional rights . . . .'"  Burns, 500 U.S. at 495.  Here, no such conduct is attributed to Defendant Lupas.

Lupas is entitled to summary judgment on Plaintiff's § 1983 claims asserted against him.

He is also entitled to high official immunity with respect to the state common law claims. "It has long been held [in Pennsylvania] that high public officials are immune from suits seeking damages for actions taken or statements made in the course of their official duties." Durham v. McElynn, 772 A.2d 68, 69 (Pa. 2001). District Attorneys in the Commonwealth of Pennsylvania are regarded as "high officials" for purposes of immunity from intentional torts purportedly committed within the scope of their official duties. See Mosley v. Observer Publ'g Co., 619 A.2d 343 (Pa. Super. 1993); McCormick v. Specter, 275 A.2d 688 (Pa. Super. 1971.) The Pennsylvania Supreme Court has explained that it is "in the public interest and therefore sounder and wiser public policy to 'immunize' public officials, for to permit slander, or liable, or malicious prosecution suits, where the official's charges turn out to be false, would be to deter all but the most courageous or the most judgment-proof public officials from performing their official duties and would thus often hinder or obstruct justice and allow many criminals to go unpunished." Durham, 772 A.2d at 69. Accordingly, Defendant Lupas is immune from liability on Plaintiff's common law claims, and he is thus entitled to summary judgment in his favor. See Gleeson, 2005 WL 1210948, at *34; Cherry v. City of Philadelphia, No. Civ. A. 04-1393, 2004 WL 2600684 at *7, (E.D. Pa. Nov. 15, 2004) (finding Philadelphia District Attorney absolutely immune from an intentional infliction of emotional distress claim because the relevant actions were taken

within the course of her official duties); Douris v. Schweiker, 229 F. Supp. 2d 391, 402-03 (E.D. Pa. 2002)(finding that district attorneys were absolutely immune from abuse of process suit because the alleged withholding of exculpatory evidence occurred during the course of their official duties).

III.  CONCLUSION

Having reviewed the record de novo and carefully considered the arguments of the parties, I have found that summary judgment in favor of Defendants Zavada and Kizis is not warranted.  Because, however, Defendant Lupas is immune from liability under the doctrine of absolute prosecutorial immunity that pertains to Plaintiffs' civil rights claims and under the doctrine of high official immunity that pertains to their common law claims, judgment in his favor is warranted.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID JASLAR, et al.,                    :
                                         :
                      Plaintiffs         :
                                         :
          vs.                            :          3:CV-05-2080
                                         :          (JUDGE VANASKIE)
DET. ROBERT ZAVADA, et al.,              :
                                         :
                      Defendants         :


<u>ORDER</u>

NOW, THIS 12th DAY OF JANUARY, 2009, for the reasons set forth in the

foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1.  The Motion for Summary Judgment filed on behalf of Defendant David W. Lupas

(Dkt. Entry 76) is GRANTED.

2.  The Motions for Summary Judgment filed on behalf of Defendants Bernard Kizis

and Robert Zavada, (Dkt. Entry 70 and Dkt. Entry 78), are DENIED.

3.  The Report and Recommendation issued on February 27, 2008 (Dkt. Entry 101)

is NOT ADOPTED.

4.  A telephonic scheduling conference shall be conducted on Monday, February 2,

2009 at 1:30 p.m.  Counsel for plaintiff is responsible for arranging the call to (570) 207-

5720, and all counsel shall be ready to proceed before the undersigned is contacted.


s/ Thomas I. Vanaskie

Thomas I. Vanaskie
United States District Judge